Good morning, Your Honors. Doug Keller on behalf of Mr. McCray. I'll try to reserve three minutes of my time, but I'll keep my eye on the clock. Good morning. Good morning. The question before this Court is whether Mr. McCray was properly convicted of two counts of promotional money laundering. Specifically, whether the two transactions charged as promotional money laundering involving sending investor funds to a bank involved the, quote, proceeds of Mr. McCray's fraud. In light of Santos, I think the answer to that question is no, for two independent reasons. First, following Santos, proceeds is defined as either gross receipts or profits, depending on the nature of the underlying transaction. Well, I have a couple, I have a question for you. If Scalaba or whatever, if that was decided before McCray was even tried, wasn't a proceeds equal profit argument available to him on direct appeal, notwithstanding the number of circuits that had rejected such an argument? I don't think there was a reasonable basis to raise that argument, Your Honor. At that point, at least ten out of the twelve circuits, including this one, had already rejected that argument. And so Mr. McCray on direct appeal was faced with the question of whether he should essentially raise that argument in light of the near unanimous authority to the contrary. And this Court, as far as I can tell, no court has ever required a defendant to raise the issue in that circumstance. Okay. So you argue that the jury conviction on wire fraud is inconsistent with an argument that the wire transfers were not central to the scheme, right? That's right, Your Honor. But if that is the case, does that mean that wire or mail fraud and money laundering counts always merge? I mean, haven't we implicitly rejected that argument in such cases as U.S. v. Bush? No. Here, the reason why they merge is not because wire fraud and money laundering always merge. It's because the government asked for a jury instruction that said that the wires had to be essential to the fraud. Okay. But are essential and central the same? Yeah, I think so. Well, I mean, that's, for you to succeed, essential and central have to be the same, right? No, I don't think so. That's one way I think I can win. Okay. But I do think they are the same. I think they're the same because they're synonyms and thesaurus. This Court has held in cases involving statutory interpretation outside this context. It just seems to me they could have different meanings. Perhaps. They certainly are similar. I give you that. But they could be something different. Well, two things. One, I do think they're synonyms for the reasons I gave in my brief. But assuming you don't agree with that, even looking at the facts, so ignoring the jury's verdict for a moment, even looking at the facts here, these transactions were central to Mr. McCrae's fraud. His fraud essentially was taking money from investors and then trading it. He made money in this fraud based on the trades. They would generate commissions. The commissions would then flow to IFL and to him. So he didn't make a single cent in this case until money was traded. So the very heart of his fraud was trading money, which is why sending money to a bank to be traded was central to his scheme. So this is on habeas, right? It is on habeas, yes, Your Honor. Okay. And I think your client wanted a hearing. I never entered a hearing? Yes. Yes. I guess my question would be, if I understand your arguments, I'm not sure what would happen in a hearing because it seems to me if you're claiming insufficiency of the evidence based on Santos, that that has to be evaluated from the evidence that was at the jury trial. I don't, I mean, can that be augmented? No, that's definitely right. So to be clear, though, there's sort of two separate, although similar claims here. There's the insufficiency of the evidence claim, which you're right, you can't augment the record. That's sort of the record. Because that would seem like that's the trial. So it's not, you know, the prosecutor doesn't get a second bite. You don't get another, you know, and it's double jeopardy if, you know, if we say something's insufficiency of the evidence, that's the ballgame, right? That's right. So to be clear, the reason for the hearing would only be in the situation in which this court finds that there was sufficient evidence in the record and we would want to claim at an evidentiary hearing. But that goes to cause and prejudice for failing to raise it. I mean, if we find that there wasn't a procedural default because you can show cause and prejudice, then you don't want an evidentiary hearing. That's correct, Your Honor. Okay. And also to sort of take a couple steps back on it, at least on the procedural default, I do want to make clear that we think we raised it. Obviously, Santos hadn't come out yet, and so he didn't raise the exact argument that the Supreme Court made in Santos, granted. At the same time, on direct appeal, he did raise a sufficiency challenge to the proceeds element of his promotional money laundering convictions. And while, again, he didn't exactly raise the exact Santos argument, he did actually argue something somewhat similar when he claimed, and I'll just quote from his brief, that the government failed to identify and allege a underlying fraud. Well, okay, on the procedural default that you're saying that you didn't do that, it's my understanding under 1965A1, the promotional money laundering, the government has to prove, one, it engaged in a financial transaction which involved proceeds from specified illegal activity, two, knew the proceeds were from illegal activity, and three, intended the clients arguing that the proceeds must be defined as profits in this case based on Santos and that there was insufficient evidence of the wire transfers involved profits, right? But you never did challenge the sufficiency of the evidence of proceeds on direct appeal, but rather challenged other elements of the money laundering convictions. I disagree, Your Honor. Mr. McCrae definitely challenged the sufficiency of the evidence of proceeds. He didn't use the word profits, I grant you that, but it was the same general claim. The claim here was whether there was sufficient evidence of proceeds, and so on direct appeal he raised what he thought was the best argument at that time given the state of the law. Now, post-Santos, he is raising a different argument, but it's the same general claim, which is simply the sufficiency of the evidence claim. Even the government has never disputed on direct appeal, he did challenge the sufficiency of the evidence. So while his argument has evolved a bit in light of new authority, the general claim is the same. And in fact, if this court looks to his decision in Van Alstyne, in that case the defendant on direct appeal raised the same claim that Mr. McCrae raised on direct appeal. The case went up to the Supreme Court, was remanded on different grounds, eventually it came before this court again. And at that point Santos had been decided, so he wanted to change his argument from this initial claim that Mr. McCrae had also raised, he wanted to change it to the Santos argument. And this court said, yes, you're making the same argument and it would normally be precluded by law of the case, but the exception to law of the case applies because of intervening authority. I think the same analysis applies here. So if, just so that I understand all this correctly, because it is a little bit, it's not confusing because of how you're presenting it, but it's a difficult issue. If a defendant's charged with both wire fraud and money laundering based on the same transaction, the government has to prove that the transaction involved the profits of the underlying scheme, that the profits of the underlying scheme where the transaction involved, where the transaction was central to the scheme and the money laundering count radically increases the defendant's maximum statutory sentence. Is that right? I think so, Your Honor. Okay. So here his currency trading scheme operated for several years and generated most of its commissions before the wire transfers were made. Am I right on that? That's right because a couple months after the wire transfers in this case, there was a search warrant executed and at that point the fraud started to fall apart. So then if I say, following that through, if the transfers were not essential to the scheme's continued operation in contrast to the payment of expenses at issue in Santos, isn't this distinguished from Santos? No, because at the end of the day, the transfers to the bank for the money to be traded, that was the scheme. And so it's sort of a – it is true that several months after these transfers that the fraud started to fall apart, but that doesn't retroactively change the nature of the scheme. This was a scheme that involved sending money to be traded. These transactions involved trades. It's hard to get something more central than that in this trade. And in fact, the government all but took that position before the jury and it took that position before this very court on direct appeal. It's only now for the first time post-Santos that the government has tried to change its view on what the facts show in this case. So is this – Mr. Santos – it's not Mr. Santos. Mr. McRae, if we were to accept your arguments, he doesn't go free. The court could go back and sentence him differently and probably get close to the same number, right? In theory, yes. I think three points, Your Honor. First, he would definitely – the statutory penalties would go away. The $5.8 million forfeiture order would go away. And I'll note that the guidelines have been changed since his – since he was sentenced. When he was sentenced, this court had a rule that you didn't get any offset from money returned to investors. So even though before the search warrant was ever executed in this case, he returned something like $19 million of the $30 million. He got sentences if he stole $30 million. This court has since changed its rule, and that's noted in Van Alsting. So his loss figure will be substantially lower. So I think he initially got a 17-and-a-half-year sentence. Presumably, his guideline or angel will be much less than that. But, of course, it's always possible the court post-Booker can do what it wants to do. So we can certainly impose the same sentence. So I can't remember how much time you said you wanted to save. About three minutes. Oh, okay. I'm sorry. I've taken a lot of your time. I want to know, what components constituted the $5.8 million that was transferred in February of 1999? It was all investor funds. So investors had sent in money to IFL's banks. So it was the actual money that they'd sent in. Was it profits in any way? I mean, how is that documented in the record? The only documentation of what was profit to either IFL or Mr. McRae were the commissions generated after their money was traded. So the only profits were commissions? Yes. And do we know whether any of those commissions were used, were put back into the firm and reused again? The record isn't dispositive, but I don't think so. What you can glean from the record is Mr. McRae took his salary, the commission, the profit of the fraud, and bought himself luxury items. And those were the basis for very different money laundering charges. But there's no evidence that he took commissions and then put that back into the fraud to grow the fraud, which is sort of – which is what promotional money laundering is. There simply isn't any evidence of that in this case. If the court has no further questions, I'll reserve the rest of my time for rebuttal. Thank you, Ken. Thank you. Good morning. Good morning, Your Honors. Valerie Chu for the United States. I have a question just to start out with, and it sort of dovetails off something that counsel for the appellant said, that your arguments are inconsistent here. You know, he's saying why his arguments – why he didn't make certain arguments. But why isn't your argument here that the wires were not central to the scheme and consistent with your position at trial and on direct appeal, that they were essential? Because they allowed Mr. McRae to promote the scheme to investors as a potential tax-free investment. Yes, Your Honor. Your Honor, at the time of the trial in this case, the government argued that these were essential because that was the element that was necessary that the Ninth Circuit model jury instruction provided. And I would add – supplement the record that it wasn't just the government that submitted that as the proposed jury instruction. The defendant's proposed jury instructions also included that because it was the articulation of the Ninth Circuit's model jury instructions at the time. And that's at the underlying docket, number 243. So are essential and central the same? No, Your Honor. I would submit that they are not. That is, that we have seen in the case law that courts can find that certain things can be essential. For example, Van Elstine, that third transaction, they found that that was sufficient. It didn't present a merger problem regarding the – whether that was a promotional money laundering as well as – it did not merge with the wire fraud because it could be promotional. It could be essential, but not necessarily an essential component of the scheme. The defendant, the appellant, wants to conflate the wire fraud element here, essential part, with central component, which is – arose. So which is the stronger word, essential or central? I would submit that a central component, sort of core or inherent – these are some of the other words that this court has used to describe what kind of a transaction would trigger a merger problem. That's central component. Now, the essential part language really stems from the sort of jurisdictional aspect of money – the wire frauds. That is that there has to be some kind of interstate transaction. The wire transmission in that sense has to be interstate. But I would note that this court has been quite clear that even a perfectly legitimate lawful wire transfer can be a part of a money laundering – sorry, a wire fraud scheme, that the scheme, the transaction itself need not itself be unlawful. So, Your Honor – So how is this different than Santos? Your Honor, I think that it's different in a number of respects. And as articulated in the court's decision in Van Elstine, the question is whether or not the transaction can be – that there is a merger issue or whether there is not. And I think the United States v. Grasso, this court, also articulated that sort of inquiry. That is, first, is there a merger problem? Secondly, did it radically increase the sentence? And third, are these transfers among co-conspirators? In Santos, Your Honor, the payments were for the runners, the cappers, and for winning lottery individuals as part of that illegal scheme. What I think sort of trying to separate the wheat from the chaff here as I come to this case sort of newly, the core question for the court is what was this money for? What was done with this money? And I think the record is now complete thanks to the court's request for that particular defense exhibit that outlines what was done with this money. And what was done was, well, there was some trading. There were some expenses paid. But a bulk of it, over $4.3 million, I believe, as articulated and set forth in that trial exhibit, went back to the client fund to pay refunds. And that, as the court noted in Van Elstein, makes it like one of that third category of paying back refunds is not a central component of the Ponzi scheme because it makes money unavailable to continue to lull investors to keep the scheme going. And Mr. McRae himself explained why he did that. He did that so that he would avoid litigation and sort of generate goodwill when things were falling apart. And so it's not a matter of looking at the subsequent transactions for their own sakes, but because they shed light on what that original transaction was for. And Van Elstein was no different. In that case, the actual charged transaction was between one of Mr. Van Elstein's partnership accounts to another of his partnership accounts. And then the testimony revealed that some of those transactions went to then pay investors a sort of distribution, and others went to pay a full refund. And so the subsequent transaction sheds light on what the charged transaction was about. And the appellant's example of, well, what does it matter? Why should we look at what happens afterwards? You go and buy a pair of shoes, for example. Well, the fact that there was money available from that transaction to buy a pair of shoes, I would submit suggests that there was enough money at least among that transaction that that was a non-expense of the scheme and or profits. And I would submit that Santos and other case law of this court that Santos left undisturbed provides that the government just needs to show that a portion, that some of the transaction involves proceeds. And this is cited at the government's, at SER 95 at note 11, that includes United States v. Garcia, U.S. v. Jackson, and more recently U.S. v. Marbella, and even post-Santos, U.S. v. Lazarenko. And Lazarenko provided that in a money laundering charge, the commingling of tainted money with clean money taints the entire account. That is, that the fact that there may be some proceeds, some criminally-derived proceeds in this transaction, even if there's some not criminally-derived proceeds, would satisfy this transaction here. Because, as the court noted, the statute provides that this transaction must involve proceeds. And the court has interpreted involves proceeds as something less than the entirety of the transaction. And I think here that the facts as set forth, now that the court has a complete record, show that there were portions of this money that went to transactions, the investor refunds that the court in Van Alstyne concluded did not present a merger problem, because they weren't meant for the essential component of the scheme. So, Your Honors, I think that there is enough here presented in the records. Setting aside what may be problematic positions on behalf of the government, I'm not choosing to rely on those. But as for the facts of these transactions, what occurred here, I would submit that there's enough here that there were proceeds of criminally-derived activity at the time that this transaction took place. And I think that what the government has submitted as far as those charts at the end of the S.E.R. demonstrate that there was money available. And I would contest the notion that, well, the only profits were generated here by after they were traded. The notion is that the $30 million that was received by investors was sort of money just to be managed, an asset management type of characterization. That's wrong, Your Honors, that that money was generated based on Mr. McRae's fraud, that the false statements, the misrepresentations are the reason that money came in. And that was established at trial by the jury verdicts of guilty on the underlying wire fraud and mail fraud, and the testimony and the evidence at trial, the submission of the brochure that Mr. McRae sent to the investors. I want to turn for a moment to the procedural default issue, and I think this is an important one to consider because we don't then need to get too far into the merger question. I would submit that Mr. McRae procedurally defaulted on this because he did not raise this issue. I would submit that on habeas review that the expansion of sort of the claim versus argument grounds for what you can and cannot bring up after having failed to bring it up before is inappropriate in this context because habeas is supposed to be an extraordinary remedy. So I would submit that we should look at very carefully what he did raise. And what he did raise was a sufficiency of the evidence as to whether there was a prior predicate specified on loan volatility that had been completed that resulted in the proceeds that was then the money laundering charge. That was the argument that was raised. Nothing about the definition or a vague definition of proceeds, meaning either gross receipts or profits. That was a challenge that was raised. That was what this court considered on direct appeal in a panel that included Judge Reinhart, and this court determined Well, we've all seen Mr. McRae, I think we figured out. Yeah. There are two different direct appeals, and I think they had those, and I had a resentencing. So we haven't seen him, but we've all touched him. Let's put it that way. Certainly. And, Your Honor, I would also suggest that this sort of near universal availability or not availability of this claim is a little bit overstated. When I looked at the claim to 10 out of 12 circuits, several of those don't really address at least specifically this kind of argument here. In particular, the Fourth Circuit's decision in U.S. v. Bolden, the challenge was to whether the act had to be completed prior to the charged transaction. Very similar to what Mr. McRae actually brought up. The Fifth Circuit of Wiley, they objected to the notion of proceeds where the transfers were of the bribery money. So the notion was that the bribery hadn't been actually consummated. So the same sort of notion, that the charged act, the charged crime, had not been yet completed by the time that the proceeds resulted. Well, I think you argued that the cause and prejudice exception to the procedural default, right? So what authority would allow us to hold that there is no prejudice based on a prediction that Mr. McRae would receive the overall sentence on remand if we reverse his promotional money laundering convictions? Your Honor, I think it would be the— I think I saw you shaking your head when he was saying something. I asked the question of appellate's counsel. I don't really usually like to look in the peanut gallery, but sometimes I do see people's heads shaking. Your Honor, I would submit that at the time that Judge Jones imposed this sentence, this 211-month sentence was available to him at that time. That is that these money laundering transactions, which were only two out of the 27 counts that this jury 11 years ago returned against Mr. McRae, did not at all drive the sentence here. So that's the amount of time. But what about he made the comments about what credit he would get for money that he returned? Is there a difference? Well, Your Honor, if that were the basis of the challenge, then the court could consider sending him back for resentencing on that particular challenge. But that would essentially allow him to get the benefit where he wouldn't otherwise sort of bootstrap himself into a benefit on sentencing that wasn't actually available to him at the time that he was sentenced in 1998. At that time, the court calculated the guidelines properly and found that the wire transfer – sorry, the wire fraud and the mail fraud guidelines drove up the base offense level to an adjusted offense level of 33. And at that range, the sentencing range was 188 to 235. And the court selected the middle of the range. The government actually recommended 188. But the court selected the middle of that range. And the guidelines at that time had mandatory language that if the guideline sentence was greater than the statutory maximum, it shall run consecutive to produce the combined sentence to equal the total punishment. That was at 5G 1.2D of the 1998 sentencing guidelines. So in looking at whether or not these two convictions were such a fundamental miscarriage of justice – that's sort of the framework for a habeas petition – that question, that is one of prejudice, I think should be looked at at the time that this sentence was actually imposed by Judge Jones. That he had that available to him whether or not the money laundering transactions were actually returned as convictions. They had no bearing on – no increase to the guidelines whatsoever. There was no plus two that we see now in the current guidelines. It was a wholly separate guideline that was lower, so they used the money laundering – the mail and wire fraud transaction. And, Your Honor, I think that the fact that there are – there was authority, the court side of Skialaba, there were at least two other courts that had also addressed this specific question. And the way that the appellants in those cases articulated it was whether or not proceeds should be defined as profits or gross receipts. And so it was out there at the time. That was the First Circuit as well as the Third Circuit. Interestingly, the Sixth Circuit had also, even much earlier, had considered that same question even prior to Skialaba. And courts of this circuit, lower courts to be sure, have determined that because of the available authority out there that this claim was in fact available. And at least five or six different cases have denied at 2255 for procedural default on that question. I think if the court should choose to sort of expand that, to overrule essentially those findings down below, it would essentially invite certainly successive 2255s in those circumstances as well as work a sort of expansion of the availability of this extraordinary writ. And I think that that's the framework to keep in mind here when considering whether to expand the mail fraud and wire fraud elements to include not just an essential part, but make it an essential component, because I think that's what the respondent or the appellant is asking the court to do, that is to make it equivalent using statutory construction and so on and so forth. But here, the jury instructions, the model jury instructions, don't have that as an element. That was the necessary proof that the government had at the time. I would submit that the facts underlying the government's arguments— You have used up your time, and I've probably gotten in 20 minutes worth at the rate you go. I apologize, Your Honor. I've been told that I talk fast. Thank you very much. Thank you. Just a few points, Your Honors. First, with respect to the argument that the $30 million must have been proceeds because it was fraudulently obtained, he committed fraud, and because he committed fraud, he obtained that $30 million. That's why he was guilty of fraud. But the promotional money laundering analysis is very different. Again, given the nature of Mr. McCrae's scheme, he didn't make any money off this scheme until he made trades, and those trades generated commissions. That's why the government's case at trial was that he made about a million dollars, because that's the money he made from commissions. He didn't make $30 million. In this case, he made that million. Second, the government's argument that simply because we know that some of this $5.8 million was eventually returned to investors, that somehow retroactively makes it no longer central is wrong. The reason why it was sent back to investors was because essentially the fraud changed once the search warrant was executed. At that point, it was essentially collapsing, and Mr. McCrae was sending money back to investors. But before then, he was trading it, which was, again, the very essence of his fraud. Two quick points about procedural default. First, on the cause and prejudice issues, I think it's important to remember that it's a prudential doctrine, and it only requires defendants to raise claims for which there's a reasonable basis. And just because the fact that other courts had rejected an argument, including this court, I don't think this court wants to encourage defendants to raise those arguments in this court in the hopes that perhaps one day Lightning will strike and the Supreme Court will grant cert and agree with the flood of decisions to the contrary. Finally, the government has never cited any authority for the idea that E. E. V. Escondido is somehow limited to the direct appeal context. This court has applied it in several different contexts, granted not habeas, but at the end of the day, it's just a rule of preservation. How do we know whether the defendant has sufficiently previously raised a claim? If the court has no further questions. Thank you, Your Honor. Thank you. Thank you.
judges: REINHARDT, WARDLAW, CALLAHAN